UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------
TYSHON SANDERS,

                            Petitioner,          **MEMORANDUM & ORDER**
                                                 16-CV-4832 (MKB)

            v.

BRIAN FISCHER, *Corrections Commissioner*,


                            Respondent.
--------------------------------------------------------------
MARGO K. BRODIE, United States District Judge:

Petitioner Tyshon Sanders, proceeding *pro se*, brings the above-captioned petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he alleges that he is being held in state custody in violation of his federal constitutional rights.  (Pet. 1, Docket Entry No. 1.) Petitioner's claims arise from a judgment of conviction following a jury trial in the Supreme Court of New York State, Richmond County, on charges of burglary in the first degree (caused physical injury), burglary in the first degree (dangerous instrument), burglary in the first degree (displayed a firearm), and assault in the second degree.  (Tr. of Trial Proceedings Before the Supreme Court of New York, Richmond County, dated Mar 3–16, 2011 ("Tr.") 442–43, Docket Entry Nos. 5-7 to -11 & 5-15.)[1]  In his petition, Petitioner raises two issues: (1) a Confrontation Clause claim, and (2) a sufficiency-of-the-evidence claim.  For the reasons stated below, the Court denies the petition.

---

[1]  The Court refers to the original page numbers in the trial transcript.

## I.  Background

### a.  Trial

Petitioner was convicted of three counts of burglary in the first degree and one count of assault in the second degree after a six-day trial in March of 2011.

#### i.  The armed burglary and assault

On March 9, 2009 at around 12:00 PM, disabled former Amtrak foreman Ganija Bojkovic (the "Victim") returned to his Staten Island home from a medical appointment and greeted his wife Ajziz Bojkovic.  (Tr. 21–24, 72.)  As his wife headed to their basement to do laundry, the Victim sat down to watch the news on television in the room next to his front door.  (Tr. 24, 72–73.)  After some time, the doorbell rang.  (Tr. 24, 73.)  The Victim opened the door to see an unfamiliar black male, approximately six feet tall with short hair, in his mid- to late-twenties, holding his screen door open.  (Tr. 24–25, 47–48, 61, 73.)  The man at the door asked for "Dave."  (Tr. 25.)  The Victim explained that no one named "Dave" lived in the Victim's home.  (Tr. 25.)

As the Victim attempted to reenter his home and close the door, he heard the man say, "let's go in."  (Tr. 26.)  At that moment, two additional black men — who had been standing on either side of the door out of the Victim's field of view — appeared and "jumped in on [the Victim]," producing a loud "bang" which the Victim's wife heard from the basement.  (Tr. 26, 49, 60, 73.)  The man coming from the left side stood about six feet tall, was in good physical shape, wore a black mask and dark clothing, and held a gun; the man coming from the right side also stood about six feet tall, wore a black-and-white striped mask, and held a silver gun.  (Tr. 26–27, 49, 57, 67.)

2

All three men began striking the Victim in the head, face, chest, and all over his body: All three used their fists and the two masked men each beat the Victim with the gun each was carrying.  (Tr. 27–28, 45, 49–52.)  The three assailants dragged the Victim into his kitchen, where they held him face-down to the ground, one using his knees and the other two using their hands and shoulders.  (Tr. 28–29, 38, 51–53, 58.)  The attack caused the Victim to bleed all over the floor, the walls, and his refrigerator.  (Tr. 37–39, 77–78.)  The beatings and screams were so loud that Wilfredo "Willie" Court, Jr. heard the commotion from his mother's home immediately adjacent to the Victim's house, as did the Victim's across-the-street neighbor Dennis J. Foster.  (Tr. 44, 110–11, 194–95.)

Hearing her husband's screams from their basement, the Victim's wife headed up the stairs and saw the Victim pinned to the ground by one or two black men she did not recognize.  (Tr. 73–75, 79.)  She ran back downstairs and fled her home through her basement door.  (Tr. 73, 75.)  As she exited her backyard through a gate, she saw another black man outside.  (Tr. 75, 79–80.)  The Victim's wife ran to her neighbor Reggie's home, screaming that two or three people were inside her home beating up her husband.  (Tr. 44, 76.)  She called the police from Reggie's house.  (Tr. 76.)  Reggie instructed her to remain with him and not to reenter her home.  (Tr. 76–77.)

Back in his kitchen, the Victim was unable to see anyone but did hear one of the men run into another room and return, saying "we clear, nobody here."  (Tr. 29, 53–54.)  The Victim also heard one of the men leave through the side door and return multiple times.  (Tr. 29–30, 53–54.)

### ii.   The assailants' flight from the scene

From his mother's house next door, Court observed a black man he did not recognize, wearing a black hoodie, white scarf, and black jeans, walking back and forth in the street in front

of the two houses, then waving in a beckoning motion with his arms towards the Victim's house. (Tr. 111–13, 115–17.)  At about this time, one of the attackers inside the Victim's house stated that they should leave because someone had called police.  (Tr. 30.)  The assailants freed the Victim and exited his home through the front door.  (Tr. 30.)  The assailants took nothing from the Victim's home.  (Tr. 41, 58–59, 78.)

After the men left, the Victim got up and began looking through his home for his wife. (Tr. 31, 41.)  Shortly thereafter, his wife called him from Reggie's house.  (Tr. 31, 44.)  After briefly speaking with his wife, the Victim — bleeding from the head — went outside and saw his three assailants joined by a fourth black man.  (Tr. 31, 194–95, 198.)  None were wearing masks, although the Victim could not get a good look at the men's faces.  (Tr. 31–32.)

From their respective vantage points, the Victim, his wife, his next-door neighbor's son Court, and his across-the-street neighbor Foster watched as the assailants ran towards their getaway vehicle — a yellow or gold car with South Carolina or North Carolina plates, parked nearby a service road that led to a highway — and hastily fled the scene.  (Tr. 30, 32, 42–43, 54–55, 66–67, 77, 113–14, 116–18, 195–98.)  These witnesses described the fleeing attackers as black males in their twenties or early thirties, each dressed in all black: one approximately six feet tall and carrying a firearm and a white scarf, handkerchief, or mask; another carrying a black bag; and a third also carrying a gun.  (Tr. 77, 113–14, 196.)  Although the men were no longer wearing masks, none of the witnesses were able to get good looks at the men's faces.  (Tr. 31, 55, 75, 77, 195–96.)

### iii.  Immediate aftermath

A fire truck arrived, followed by police a few minutes later.  (Tr. 32, 55.)  Responding officers noted that both the Victim and his wife were scared, nervous, and shaking, and the

Victim was bleeding.  (Tr. 84–85.)  They found the house "in disarray," with signs of a struggle: items knocked over, shoes and clothing scattered and out of place, blood on the walls and floor, and a dresser drawer opened.  (Tr. 84, 87, 159, 175.)

During a search of the Victim's residence, police also swabbed a dresser for possible DNA trace evidence, but the sample provided insufficient DNA material to perform DNA testing or generate a DNA profile.  (Tr. 122, 229.)  Police attempted but failed to recover any fingerprints.  (Tr. 125, 127–29.)

Police recovered a black ski mask on the kitchen floor.  (Tr. 87–88, 121–23, 128, 160. 175–77.)  No one in the Victim's family owned a black ski mask.  (Tr. 34, 80–81.)  At trial, the Victim identified the black mask police recovered as the mask worn by one of his assailants. (Tr. 34–35.)  As police processed the crime scene, the Victim's wife headed back home to find her home covered in blood and her husband bleeding significantly, mostly from the head.  (Tr. 77–78.)  An ambulance eventually took the Victim to the hospital.  (Tr. 55, 126.)  In significant pain from the attack, the Victim received medical attention, including eight stitches on the top of his head and an overnight hospital stay.  (Tr. 33, 45, 55.)  He was still in pain when he testified at trial two years later.  (Tr. 46.)

### iv.  Petitioner's arrest

In October of 2009, police arrested Petitioner.  (Tr. 162–63.)  At the time of his arrest, Petitioner was twenty years old, stood six feet tall, weighed 180 pounds, and stated that he lived in Staten Island.  (Tr. 163.)  The jury was able to observe that Petitioner is a black male.[2]  (Tr. 339.)

---

[2] Although there is no testimony at trial establishing Petitioner's race or sex, prosecutors argued during summation that Petitioner matched the description of the Victim's assailants:

###### v.   DNA testing

As part of their investigation, the police collected DNA samples from Petitioner, the

Victim, and the Victim's wife.  (Tr. 126, 134, 137.)  J. Lucas Herman, a Criminalist (Level II) in

the Forensic Biology Department of the Office of the Chief Medical Examiner ("OCME"),

testified about DNA testing conducted in Petitioner's case.  (Tr. 200–01, 247.)  No other witness

testified concerning DNA testing.

Herman testified that at OCME, a single analyst does not conduct all of the testing related

to a single piece of evidence.  (Tr. 204, 297–98.)  Rather, there are multiple laboratories within

OCME and each analyst might work at a single laboratory that performs part of the process for a

week at a time.  (Tr. 204.)  Multiple analysts will work on each piece of evidence as that

evidence progresses through the process of forensic analysis.  (Tr. 204–05.)  OCME uses this

system to ensure timely processing of the evidence it receives for analysis.  (Tr. 298.)

Herman testified that OCME's procedure for DNA testing involves several steps.  OCME

will receive the evidence and confirm the chain of custody.  (Tr. 221.)  OCME will also confirm

that the evidence matches the description in the accompanying documentation.  (Tr. 221.)  For an

item of clothing, OCME may cut out areas with visible stains that may contain biological

material and will use a razor blade to scrape the item in the areas where the clothing likely

contacted its wearer.  (Tr. 223, 231–32.)  The next step is to conduct an "extraction," obtaining

DNA from the cell nuclei in the sample.  (Tr. 223.)  The "quantitation" stage comes next, where

---

"Let's consider the defendant for a second.  . . .  He is black."  (Tr. at 339.)  When the identity of
the perpetrator of a crime is in question, New York law allows jurors to compare the appearance
of the defendant in the courtroom to the appearance of the perpetrator.  *See People v. Johnson*, --
- N.Y.S.3d ---, No. 2019-5683, Ind. No. 4843/16, 2021 WL 2459399, at *1 (App. Div. June 17,
2021) ("The jurors were able to see the video and compare defendant's appearance, including his
distinctive tattoos, with the appearance of the assailant shown in the video.").

analysts determine if the sample contains DNA and if so, how much.  (Tr. 223.)  The next portion of the testing procedure, "amplification," involves making millions of copies of sixteen portions of the DNA strand which OCME uses for testing.  (Tr. 224.)  Next, OCME uses a DNA typing instrument and feeds the resulting information into a computer.  (Tr. 225.)  An analyst reviews those results, which hopefully generate a DNA profile for the sample.  (Tr. 225.) Herman testified that his role was to "review[] the results of the tests performed by other analysts and put those results together into a report," or put another way, to "analyze[] and review[] the final results from the testing that was performed."  (Tr. 206, 226.)

According to Herman, the black ski mask recovered from the Victim's home had a reddish-brown stain, which OCME analysts cut out for separate analysis.  (Tr. 232, 234–35.) Analysts performed a Kastle-Meyers test on the stain, which came back positive for the presence of blood.  (Tr. 235, 237.)  OCME analysts also collected scrapings from the inside of the mask — the portions most likely to contact the wearer's face — but avoided scraping the area stained with blood to avoid cross-contamination.  (Tr. 236, 243–44.)  OCME put one sample from the stained portion of the mask and one sample from the scrapings of the rest of the mask through the extraction, quantitation, amplification, and typing steps of the DNA analysis.  (Tr. 236–38.) Herman based his testimony about these tests from the notes of other analysts in OCME's case file, which had been introduced into evidence, but he did not perform each of these steps himself. (Tr. 228, 233, 235–36, 277–79, 281.)

Herman did perform the final-level analysis on the samples in Petitioner's case.  He analyzed and interpreted the results generated at the earlier stages of the process, created a "determined profile" based on those results, and wrote his conclusions in a report.  (Tr. 227, 238,

251, 276, 280–81.)  Herman testified that his role in the process — that is, performing this analysis — constitutes conducting a DNA test.  (Tr. 281.)

Herman testified concerning the results of his analysis.  First, his analysis showed that the sample with the blood stain produced a DNA profile from a male contributor, who Herman designated male donor A.  (Tr. 238–39, 244.)  Herman testified that this could be the result of blood seeping from the outside of the mask to the inside.  (Tr. 244.)  Second, Herman's analysis showed that the sample with the scrapings produced a mixture of two DNA profiles: one contribution from male donor A and a second contribution — about three to five times larger than the first contribution — from a second male donor, who Herman designated male donor B.  (Tr. 239–40, 244.)  Herman's analysis indicated that the DNA profile for male donor A matched the Victim.  (Tr. 239–40.)  Herman's analysis also indicated that the DNA profile of the male donor B — the major contributor — matched Petitioner's DNA profile.  (Tr. 247, 275.)

### vi.  Verdict and sentence

The jury found Petitioner guilty of burglary in the first degree (caused physical injury), burglary in the first degree (dangerous instrument), burglary in the first degree (displayed firearm), and assault in the second degree.[3]  (Tr. 442–43.)  The Trial Court sentenced Petitioner to fifteen years' incarceration followed by five years of post-release supervision.  (Tr. of Sent'g Proceedings dated May 20, 2011, at 10–11, Docket Entry No. 5-12.)

### b.  Direct appeal

Petitioner appealed his conviction to the Appellate Division, Second Department (the "Appellate Division").  Petitioner's counsel raised one issue — that the Trial Court violated the

---

[3]  This was Petitioner's second trial.  The first trial ended in a hung jury because the jurors did not reach a unanimous verdict after twenty hours of deliberation over a four-day period.  (Tr. of Trial Proceedings dated Oct. 21, 2010, at 3–7, Docket Entry No. 5-14.)

Confrontation Clause of the Sixth Amendment by failing to require testimony by additional OCME analysts involved in the DNA testing process.  (Pet'r App. Div. Br. 13–21, Docket Entry No. 5-1.)  Petitioner filed a *pro se* supplemental brief in which he alleged that prosecutors failed to adduce sufficient evidence to support his convictions and that his convictions were against the weight of the evidence because the only link between Petitioner and the crime scene was the presence of his DNA on a single, movable object recovered from the Victim's home.  (Pet'r App. Div. Suppl. Br. 9–20, Docket Entry No. 5-3.)

The Appellate Division affirmed Petitioner's convictions.  *People v. Sanders*, 987 N.Y.S.2d 461, 462 (App. Div. 2014).  First, the Appellate Division rejected Petitioner's claim under the Confrontation Clause, holding that prosecutors' "expert conducted the critical analysis linking [Petitioner]'s DNA to the DNA found at the crime scene," and that prosecutors "were not required to present the testimony of each analyst who contributed to the process and who developed the reports."  *Id.* at 463.  Second, the Appellate Division held, without substantial discussion, "that the evidence was legally sufficient to establish [Petitioner]'s guilt beyond a reasonable doubt."  *Id.*  Finally, the Appellate Division, also without substantial discussion, "f[ou]nd that the verdict of guilt was not against the weight of the evidence."  *Id.*

"[P]etitioner sought leave to appeal all issues raised below to the New York Court of Appeals."[4]  (Respt.'s Am. Br. 9, Docket Entry No. 6.)  The Court of Appeals denied leave to appeal.  *People v. Sanders*, 26 N.Y.3d 935 (2015).

---

[4] The record before this Court does not include the parties' filings before the Court of Appeals.  However, in light of Respondent's concession, the Court assumes that Petitioner properly exhausted his state court remedies concerning the two claims he brings in his federal habeas petition.

### c.   The petition

The Court received the instant petition for a writ of *habeas corpus* on August 29, 2016. (Pet. 1.)[5]  Petitioner raises the two claims he raised on direct appeal.  First, he brings a Confrontation Clause claim, arguing that prosecutors should not have introduced all of the DNA evidence via the testimony of OCME criminalist Herman without requiring testimony from the other OCME analysts who assisted or participated.  (*Id.* at 7–16.)  Second, Petitioner brings a sufficiency-of-the-evidence claim, arguing that the DNA evidence on the ski mask did not constitute legally sufficient evidence to link him to the burglary.  (*Id.* at 19–33.)

## II.   Discussion

### a.   Standard of review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of *habeas corpus* by a person in custody pursuant to a state court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A petitioner is required to show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2); *see also Shoop v. Hill*, 586 U.S. ---, ---, 139 S. Ct. 504, 506 (2019) (per curiam) ("[H]abeas relief may be granted only if the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of,' Supreme Court precedent that was 'clearly established' at the time of the adjudication." (first

---

[5]  Because the petition is not consecutively paginated, the Court refers to the case numbers assigned by the electronic filing system.

quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)); and then citing *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013))); *Kernan v. Hinojosa*, 578 U.S. 941, ---, 136 S. Ct. 1603, 1604 (2016) (per curiam); *Hittson v. Chatman*, 576 U.S. 1028, 1028 (2015) (mem.); *Woods v. Donald*, 575 U.S. 312, 313 (2015) (per curiam); *Johnson v. Williams*, 568 U.S. 289, 292 (2013). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001)); *see also Kernan*, 578 U.S. at ---, 136 S. Ct. at 1606; *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Under the section 2254(d) standards, a state court's decision must stand as long as "'fairminded jurists could disagree' on the correctness of that decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 365 (2000); *see also Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) ("As we have repeatedly emphasized, however, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting 28 U.S.C. § 2254(d)(1))); *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the . . . [state] [c]ourt's decision."). A state court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of

the petitioner's case. *Williams*, 529 U.S. at 412–13. In order to establish that a state court decision is an unreasonable application of federal law, the state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citing *Williams*, 529 U.S. at 410, 412). The decision must be "objectively unreasonable." *Id.* (citing *Williams*, 529 U.S. at 409).

A court may also grant habeas relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[S]tate-court factual determinations [are not] unreasonable 'merely because [a federal post-conviction court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Rather, factual determinations made by the state court are "presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Even if "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on *habeas* review that does not suffice to'" overturn a state court's factual determination. *Wood*, 558 U.S. at 301 (alteration in original) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). A court may overturn a state court's factual determination only if the record cannot "plausibly be viewed" as consistent with the state court's fact-finding or if "a reasonable factfinder must conclude" that the state court's decision was inconsistent with the record evidence. *Rice*, 546 U.S. at 340–41.

### b. Confrontation Clause

Petitioner argues that the Trial Court should not have permitted OCME criminalist Herman to testify about all aspects of the DNA testing process without requiring testimony from

the other participating or assisting OCME analysts.  (Pet. 7.)  Petitioner is not entitled to relief on

this claim because the Appellate Division rejected this claim, *People v. Sanders*, 987 N.Y.S.2d

461, 462–63 (App. Div. 2014), and did not unreasonably apply clearly established Supreme

Court precedent in doing so.[6]

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

the witnesses against him . . . ."  U.S. Const. amend VI.  This constitutional provision, known as

the Confrontation Clause, generally prohibits the use of testimonial statements against a criminal

defendant unless that defendant has an opportunity to cross-examine the maker of the statement.

*See Crawford v. Washington*, 541 U.S. 36, 68–69 (2004); *see also Whorton v. Bockting*, 549 U.S.

406, 413 (2007) ("[O]ur opinion in *Crawford* . . . held that '[t]estimonial statements of witnesses

absent from trial' are admissible 'only where the declarant is unavailable, and only where the

defendant has had a prior opportunity to cross-examine [the witness].'" (quoting *Crawford*, 541

U.S. at 59)).  Statements are "testimonial" when their "primary purpose . . . is to establish or

prove past events potentially relevant to later criminal prosecution."  *Ohio v. Clark*, 576 U.S.

237, 244 (2015) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).  "[W]hen a court

must determine whether the Confrontation Clause bars the admission of a statement at trial, it

should determine the 'primary purpose of the [statement]' by objectively evaluating the

statements and actions of the parties to the encounter, in light of the circumstances in which the

[statement] occurs."  *Michigan v. Bryant*, 562 U.S. 344, 370 (2011).

An out-of-court statement does not acquire a testimonial character merely because the

statement will be useful in a later criminal prosecution.  For example, a domestic violence victim

---

[6]  Petitioner does not argue that the Appellate Division unreasonably determined the
facts.  *See* 28 U.S.C. § 2254(d)(2).

reporting an ongoing assault to a 911 dispatcher most likely makes her statements for the purpose of ensuring her personal safety, even if her statements could later be useful to prosecute the abuser.  *See Davis*, 547 U.S. at 827–28.  Likewise, a gunshot-wound victim who — immediately before being transported by ambulance to a hospital for medical treatment — tells police about the circumstances of his shooting (including the identity of the shooter and the location of the shooting) most likely does so to assist police in apprehending a gunman on the loose, even if his statements could assist a subsequent prosecution of the assailant.  *See Bryant*, 562 U.S. at 371–78.  Similarly, a discussion between a three-year-old child and her preschool teachers about potential child abuse at the child's home most likely has the primary purpose of safeguarding the child from further abuse, even if those statements could support later criminal charges against the abuser.  *See Clark*, 576 U.S. at 246–49.

The out-of-court statements of expert witnesses conducting scientific analysis of forensic evidence are also subject to the Confrontation Clause.  For example, an affidavit of a state laboratory analyst, swearing that the analyst chemically tested a particular substance and found it to contain a prohibited narcotic, constitutes a testimonial statement such that the affidavit may not be admitted into evidence absent an opportunity for the criminal defendant to cross-examine the analyst.  *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009).  These affidavits constitute testimonial statements because they "are incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" *id.* (quoting *Crawford*, 541 U.S. at 51), and because "the affidavits [were] 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" *id.* (quoting *Crawford*, 541 U.S. at 52).  A signed statement attesting to an analysis of the blood-alcohol content of a defendant's blood sample likewise qualifies as a testimonial statement

14

to which the Confrontation Clause applies.  *See Bullcoming v. New Mexico*, 564 U.S. 647, 663–65 (2011).  These statements are "'formalized' in a signed document," *id.* at 665 (quoting *Davis*, 547 U.S. at 837 n.2), which was "created solely for an 'evidentiary purpose' [and] made in aid of a police investigation," *id.* at 664 (quoting *Melendez-Diaz*, 557 U.S. at 311).

However, not everyone "whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Melendez-Diaz*, 557 U.S. at 311 n.1.  This is especially true with regard to DNA evidence.  In a recent federal habeas decision, the Second Circuit characterized clearly established Supreme Court precedent as follows: "[T]he Supreme Court has never held that the Confrontation Clause requires an opportunity to cross examine each lab analyst involved in the process of generating a DNA profile and comparing it with another, nor has it held that uncertified, unsworn notations of the sort at issue here are testimonial."[7] *Washington v. Griffin*, 876 F.3d 395, 407 (2d Cir. 2017).  A plurality of the Supreme Court has noted that "in many labs, numerous technicians work on each DNA profile.  When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures." *Williams v. Illinois*, 567 U.S. 50, 85 (2012) (plurality opinion) (citations omitted).  Given this primary purpose, these analysts' notes and written materials concerning their preliminary role in the DNA analysis would not constitute testimonial statements to which the Confrontation Clause applied.  *See Clark*, 576 U.S. at 244 (applying the primary purpose test); *Bryant*, 562 U.S. at 370 (same).

---

[7] The Court properly relies on circuit precedent in the 28 U.S.C. § 2254(d)(1) analysis, because a lower court may, "in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Petitioner has not shown that the Appellate Division unreasonably rejected his Confrontation Clause claim. Petitioner complains that OCME criminalist Herman could not properly have testified to the steps other analysts undertook to process the evidence for DNA testing and argues that prosecutors were required to produce each of those analysts for cross-examination. (Pet. 7–10.) However, as the Second Circuit has explained, no clearly established Supreme Court precedent has created the Confrontation Clause principle Petitioner seeks to have the Court apply. *See Washington*, 876 F.3d at 407. In fact, a plurality of the Supreme Court has suggested that the notes and written materials of forensic analysts involved in the preliminary stages of DNA testing are non-testimonial, rendering the Confrontation Clause inapplicable. *Williams*, 567 U.S. at 85 (plurality opinion).[8]

The Confrontation Clause entitled Petitioner to cross-examine the DNA analyst who determined that the DNA on the black ski mask matched Petitioner's DNA, and the record reflects that Herman was the analyst. Herman performed the final-level DNA analysis, reviewed the results of OCME's preliminary evidence processing, produced the relevant DNA profiles, and expressed his expert opinion that Petitioner's DNA matched the DNA from the black ski mask recovered at the Victim's home after the attack. As Herman testified, his actions amounted to the performance of a DNA test. Thus, Petitioner's Confrontation Clause rights were not

---

[8] The Second Circuit has suggested that the 4-1-4 split decision in *Williams* means that *Williams* contains no holding that can constitute clearly established Supreme Court precedent for federal habeas purposes. *See Garlick v. Lee*, 1 F.4th 122, 133 (2d Cir. 2021). Thus, the absence of a holding in *Williams* underscores the Second Circuit's conclusion in *Washington*, 876 F.3d at 407, that no clearly established Supreme Court precedent requires the live testimony of every analyst involved in the processing of DNA evidence. Where a plurality of the Supreme Court suggests that the Confrontation Clause does *not* require such live testimony, it suggests that no clearly established Supreme Court precedent holds that the Confrontation Clause *does* require such live testimony. *Cf. Edwards v. Goord*, 362 F. App'x 195, 199 (2d Cir. 2010) (holding that a fractured Supreme Court decision does not constitute clearly established Supreme Court precedent sufficient to justify federal habeas relief).

violated because prosecutors produced Herman at trial and Petitioner's counsel cross-examined Herman. *See Pitre v. Griffin*, No. 16-CV-6258, 2016 WL 7442653, at *9 (E.D.N.Y. Dec. 26, 2016) ("Here, petitioner had the opportunity to cross-examine the only expert that expressed an opinion to the jury tying the victim's DNA to petitioner's clothing. . . . At this point in the development of the law on the right to confrontation over DNA testing, no Supreme Court precedent requires more.").

In sum, no clearly established Supreme Court precedent holds that the Confrontation Clause entitles a criminal defendant to cross-examine each analyst involved in preliminary stages of forensic evidence processing. *Id.* ("*Williams* leaves this area of the law muddled, and AEDPA requires reasonable clarity if habeas relief is to be granted."). Indeed, Petitioner concedes that "the Confrontation Clause law isn't clear." (Pet'r Reply Br. 5, Docket Entry No. 7.) As a result, the Appellate Division could not have unreasonably applied any clearly established Supreme Court precedent if the Supreme Court has never clearly established the precedent supporting Petitioner's argument. AEDPA therefore prohibits federal habeas relief for Petitioner's Confrontation Clause claim. *See* 28 U.S.C. § 2254(d)(1).

### c.   Sufficiency of the evidence

Petitioner contends that prosecutors adduced insufficient evidence to convict him. (Pet. 19.) Because the Appellate Division did not unreasonably apply clearly established Supreme Court precedent or unreasonably determine the facts when it rejected Petitioner's claim, Petitioner is not entitled to federal habeas relief on this claim.

"[F]ederal habeas courts must consider a petitioner's federal due process claim that the evidence in support of his conviction was insufficient to have led a rational trier of fact to find him guilty beyond a reasonable doubt." *Justices of Bos. Mun. Court v. Lydon*, 466 U.S. 294, 303

n.5 (1984).  "[E]vidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Pilon v. Bordenkircher*, 444 U.S. 1, 2 (1979) (per curiam).  The inquiry "focuses on whether *any* rational juror could have convicted."  *Schlup v. Delo*, 513 U.S. 298, 330 (1995) (emphasis added).  Stated in the negative, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if *no* rational trier of fact could have agreed with the jury."  *Smith*, 565 U.S. at 2 (emphasis added).  This "inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

This "deferential federal standard . . . leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial."  *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam).  Therefore, "[a] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326); *see also House v. Bell*, 547 U.S. 518, 538 (2006).  This is because "[i]t is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial."  *Smith*, 565 U.S. at 2.  This "limited review" ensures courts "do[] not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson*, 443 U.S. at 319).  The "deferential standard" precludes

18

"fine-grained factual parsing" of the record. *Johnson*, 566 U.S. at 655. Likewise, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup*, 513 U.S. at 330.

On federal habeas review, a petitioner challenging a conviction based on the sufficiency of the evidence must satisfy a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam). The standard is twice-deferential because "the deference to state court decisions required by [28 U.S.C.] § 2254(d) is applied to the state court's already deferential review." *Smith*, 565 U.S. at 7 (citing *Renico v. Lett*, 559 U.S. 766, 773 (2010)). Such "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable.'" *Matthews*, 567 U.S. at 43 (quoting *Smith*, 565 U.S. at 2). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that [federal] judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Smith*, 565 U.S. at 2. When conducting a review for sufficiency of the evidence, "federal courts must look to state law for 'the substantive elements of the criminal offense.'" *Johnson*, 566 U.S. at 655 (quoting *Jackson*, 443 U.S. at 324 n.16). The relevant substantive elements come from state law itself, not from the judge's instructions to the jury. *See Musacchio*, 577 U.S. at 243.

The jury in Petitioner's case convicted him of four separate crimes: (1) burglary in the first degree (caused physical injury), (2) burglary in the first degree (dangerous instrument), (3) burglary in the first degree (displayed a firearm), and (4) assault in the second degree. (Tr. 442–44.) Each of the burglary convictions shares the same preliminary elements: "A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein." N.Y. Penal L. § 140.30. In addition, "the

offender or another participant in the crime" must engage in certain specified conduct while "effecting entry or while in the dwelling or in immediate flight therefrom." *Id.*

For burglary which causes physical injury, the specified conduct is that the offender "[c]auses physical injury to any person who is not a participant in the crime." N.Y. Penal L. § 140.30(2). "'Physical injury' means impairment of physical condition or substantial pain." N.Y. Penal L. § 10.00(9). For burglary involving a dangerous instrument, the specified conduct is that the offender "[u]ses or threatens the immediate use of a dangerous instrument." N.Y. Penal L. § 140.30(3). "'Dangerous instrument' means any instrument, article or substance, . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." N.Y. Penal L. § 10.00(13). "Serious physical injury," in turn, "means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal L. § 10.00(10). Dangerous instruments include firearms. *People v. Gamble*, 23 N.Y.S.3d 414, 416 (App. Div. 2016). For burglary involving display of a firearm, the specified conduct is that the offender "[d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm."[9] N.Y. Penal L. § 140.30(4).

"A person is guilty of assault in the second degree when: . . . [w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." N.Y. Penal L. § 120.05(2). The same

---

[9] Burglary involving display of a firearm permits "an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged." N.Y. Penal L. § 140.30(4). Petitioner has not asserted this defense.

statutory definitions of "physical injury" and "dangerous instrument" apply to assault as they do to burglary.  N.Y. Penal L. § 10.00(9), (13).

Prosecutors presented sufficient evidence to support a jury's conclusion that *someone* committed each of these four crimes against the Victim.  The Victim testified that three men invaded his home, violently attacked him, beat him with guns, and searched his home for "Dave" before fleeing the scene.  (Tr. 25–28, 45, 49–54.)  Multiple witnesses testified to seeing the men flee the scene with one or more guns, and to the bloody condition of the Victim's home following the attack.  (Tr. 113–14, 196.)  The Victim testified to requiring medical care, including stitches and an overnight hospital stay.  (Tr. 33, 45, 55.)  A rational jury could have concluded that *someone* committed each of these crimes against the Victim, and Petitioner does not contend otherwise.

Rather, Petitioner argues that insufficient evidence exists to show that *he* committed these crimes against the Victim.  Given the deferential standard which applies to review of sufficiency-of-the-evidence claims, and the additional deference afforded to state court decisions on federal *habeas* review, Petitioner cannot establish a claim.

The Victim testified that one of his assailants wore a black ski mask.  (Tr. 27.)  Police testified that they later recovered a black mask from the Victim's home, and the Victim identified that ski mask as the one his assailant wore.  (Tr. 34–35.)  Both the Victim and his wife testified that no one in their household owned a black ski mask.  (Tr. 34, 80.)  OCME criminalist Herman testified that DNA on the mask matched Petitioner's DNA.  (Tr. 275.)  In addition, Petitioner also fit the physical description of the Victim's assailant.  On sufficiency-of-the-evidence review, this Court must view the evidence in the light most favorable to the prosecution while resolving any disputes of fact in prosecutors' favor, and determine whether *any* rational

juror could have found Petitioner guilty. *See McDaniel*, 558 U.S. at 133.  The inference a
reviewing court must draw is that Petitioner, and not some other person, wore the mask
recovered from the Victim's home when Petitioner and two unidentified males committed the
burglary and assault against the Victim in his home.  The Appellate Division did not
unreasonably apply clearly established Supreme Court precedent nor did it unreasonably
determine the facts when it reached this conclusion.  Accordingly, the Court rejects Petitioner's
sufficiency-of-the-evidence claim.  *See* 24 U.S.C. § 2254(d)(1), (2).

## III.   Certificate of appealability

Having denied the petition for a writ of *habeas corpus*, this Court grants a certificate of
appealability for Petitioner's Confrontation Clause claim but denies a certificate of appealability
for Petitioner's sufficiency-of-the-evidence claim.

"The district court must issue or deny a certificate of appealability when it enters a final
order adverse to the applicant."  Rule 11(a) Gov'g Sec. 2254 Cases in the U.S. Dist. Cts.  This
Court must issue a certificate of appealability "only if the applicant has made a substantial
showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This means that a
habeas petitioner must demonstrate "that reasonable jurists could debate whether (or, for that
matter, agree that) the petition should have been resolved in a different manner or that the issues
presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*,
529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

"This threshold question should be decided without 'full consideration of the factual or
legal bases adduced in support of the claims.'"  *Buck v. Davis*, 580 U.S. ---, ---, 137 S. Ct. 759,
773 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)).  "Obtaining a certificate of
appealability 'does not require a showing that the appeal will succeed,' and "[courts] should not

22

decline the application . . . merely because [they] believe[] the applicant will not demonstrate an entitlement to relief." *Welch v. United States*, 578 U.S. ---, ---, 136 S. Ct. 1257, 1263–64 (2016) (quoting *Miller-El*, 537 U.S. at 337). In fact, a certificate of appealability may issue even if "every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 337–38.

The Court grants a certificate of appealability for Petitioner's Confrontation Clause claim. The 4-1-4 split decision in *Williams* renders Confrontation Clause doctrine as it applies to DNA analysis sufficiently unclear that reasonable jurists could at least debate whether Petitioner was entitled to cross-examine additional DNA analysts involved in OCME's forensic evidence processing. As discussed above, the Court concludes that because of the absence of clarity on the Confrontation Clause's contours, no *clearly established* Supreme Court precedent exists to support Petitioner's claim, and the Court doubts that any reasonable jurist would find otherwise. However, because the scope of the Confrontation Clause is at least debatable, the Court must issue a certificate of appealability.

The Court denies a certificate of appealability for Petitioner's sufficiency-of-the-evidence claim because prosecutors presented evidence to support every element of every crime of conviction. A reviewing court must credit this evidence and make all inferences in prosecutors' favor. One such inference is that Petitioner's DNA appears on the black ski mask because Petitioner wore that mask during the attack on the Victim. Another such inference is that police recovered the black ski mask because Petitioner left it there as he fled the Victim's home following the assault. Petitioner's contention that the DNA evidence was insufficient to link him to the attack would require a reviewing court to disregard these inferences — something a

reviewing court may not do.  After drawing these required inferences, no reasonable jurist could overturn the jury's verdict due to insufficient evidence.  Accordingly, this claim does not warrant a certificate of appealability.

## IV.  Conclusion

For the foregoing reasons, the Court denies the petition for a writ of *habeas corpus*.  The Court issues a certificate of appealability for Petitioner's Confrontation Clause claim, but denies a certificate of appealability for his sufficiency-of-the-evidence claim.  The Clerk of Court is directed to enter judgment, mail a copy of this Memorandum and Order to Petitioner, and close the case.

Dated:  August 3, 2021
          Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge